687 P.2d 1180

**STATE of Arizona, Appellee,**

v.

**Rufus Junior MINCEY, Appellant.**

No. 3283–3.

Supreme Court of Arizona,
In Banc.

April 4, 1984.
Reconsideration Denied May 22, 1984.

Robert K. Corbin, Atty. Gen., Phoenix, Stephen D. Neely, Pima County Atty., D. Jesse Smith, William Randolph Stevens, Jr.,

Deputy County Attys., Tucson, for appellee.

Frederic J. Dardis, Pima County Public Defender, Lawrence H. Fleischman, Asst. Public Defender, Tucson, for appellant.

GORDON, Vice Chief Justice:

On May 28, 1982, a jury found appellant, Rufus Junior Mincey, guilty of second-degree murder in violation of A.R.S. § 13–452 [repealed by 1977 Session laws, ch. 142, § 15.]. He was sentenced to a term of not less than twenty-five years nor more than life. Timely appeal was filed from the conviction. This Court has jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 13–4031. We affirm the conviction and the sentence.

This is the third time this matter has been before this Court. The incident giving rise to the charges against appellant occurred on October 28, 1974. In 1975, a jury convicted appellant of first-degree murder, assault with a deadly weapon, unlawful sale of narcotics, unlawful possession of narcotic drugs for sale, and unlawful possession of narcotic drugs. On appeal, we reversed the murder and assault convictions and affirmed the convictions on the drug charges. *State v. Mincey [Mincey I]*, 115 Ariz. 472, 566 P.2d 273 (1977). The United States Supreme Court reversed the narcotic convictions. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). In 1979, a jury convicted appellant of second-degree murder, assault with a deadly weapon, unlawful offer to sell narcotics, and unlawful possession of a narcotic drug for sale. On appeal, this Court reversed the murder conviction. *State v. Mincey [Mincey II]*, 130 Ariz. 389, 636 P.2d 637 (1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982).

Although each of our previous opinions contains detailed factual statements, the evidence adduced at the third trial differs somewhat from that of the prior trials and we will, therefore, restate the facts. Despite some conflicts in the testimony, we view the evidence in the light most favorable to upholding the verdict. In addition

to the following general statement of facts, additional facts will be related as made necessary by the legal issues raised.

Sometime prior to October 28, 1974, police informant Tom Read arranged with Charles Ferguson to purchase a quantity of heroin. Read then contacted the Tucson Metropolitan Area Narcotics Squad (Metro). He introduced agent Barry Headricks to Ferguson as Brian, a chemist who was to be the purchaser of the heroin. The sale was set for the midafternoon of October 28, 1974.

Prior to the time set for the sale, Ferguson went to appellant's apartment to discuss the transaction. Several other people, John Hodgman, Carol Diane Greenwalt, and Deborah Johnson, were present. When Ferguson left to get Officer Headricks, Hodgman told appellant that Ferguson looked like someone who had been following him the previous week. It was disputed at trial whether, in this statement, Hodgman called Ferguson a "guy," a "boob," or a "narc." There was testimony that Hodgman's statement upset appellant. Hodgman and Greenwalt then went outside to take a look around the apartment complex. While outside, Hodgman saw Ferguson and two other persons unknown to him talking together in the parking lot. Upon returning to appellant's apartment, Hodgman told appellant what he had seen and that the people looked "suspicious." Appellant responded that he hoped the people outdoors were not "pigs." Hodgman then left to take a second look around outside.

Also earlier on October 28, Officer Headricks met with a team of undercover Metro agents to plan the "buy-bust."[1] Officer Headricks was fitted with an electronic monitoring device so that the rest of the team of Metro agents could overhear the conversations that Headricks had with the heroin seller. The Metro agents' plan was

that Officer Headricks would pose as a buyer, go to the apartment, and test the heroin. If it looked good, he was to leave the apartment indicating that he had to get his "money man" (Officer Schwarz). When the two officers returned and entered the apartment, still posing as heroin buyers, the remaining officers were supposed to rush in and arrest all the individuals in the apartment.

Officers Headricks and Schwarz drove to the apartment complex in an unmarked car. In other unmarked cars, several other Metro agents and a deputy county attorney established surveillance points around the apartment complex. Officer John Bright noticed a couple (later identified as Hodgman and Greenwalt) walking around the apartment parking lot. Officers Headricks and Schwarz noticed the same couple when they drove into the parking lot.

Ferguson and Officer Headricks proceeded to appellant's apartment to begin the heroin transaction. Once inside the apartment, Officer Headricks was introduced to appellant as Brian, a chemist. Appellant took Ferguson and Officer Headricks into the bathroom and showed them the heroin. Officer Headricks conducted a field chemical test on the heroin. Over the monitoring device, the other undercover officers overheard Officer Headricks indicating that the narcotics looked good and that he would go out, get his money man, and return to complete the sale. As he walked back to the car, Officer Headricks told the other officers, via the monitoring device, which apartment he had been in, that there were three people in the apartment, a black male (appellant), a white male (presumably Ferguson), and a white female (presumably Greenwalt), that the white male was armed with a gun, and that the narcotics were in the bathroom. Just before Officer Headricks reached the car, Officer Schwarz saw

---

**1.** As we noted in *Mincey I* 115 Ariz. at 475, 566 P.2d at 276, "[a] 'buy-bust' occurs when the undercover agent or agents make contact with a person who allegedly has illegal drugs for sale and make an offer to buy. If the agent sees the drugs or has enough information to be sure that the person does have the drugs, then an arrest is made. Commonly, as here, the plan is for the agent to leave momentarily and then a number of agents will come back to make the arrests. The usual plan is for the original undercover agent to get the door opened using his undercover identity and then the rest of the agents rush in."

the same man he had seen earlier (Hodgman) run out into the parking lot, look both directions, and quickly head back into the apartment complex. At that time Officer Schwarz had no reason to connect this man with the heroin transaction.

The Metro agents then began to carry out the buy-bust explained above. Officer Headricks and Schwarz, still posing as buyer and money man, went to the apartment door with guns drawn but not visible. The other Metro agents and the deputy county attorney positioned themselves, supposedly out of sight of the apartment, in the hallway. Officer Headricks knocked on the door. It was opened by Hodgman who apparently did see one of the other agents behind Officers Headricks and Schwarz. Hodgman then attempted to shut the door. Officer Headricks, in a low voice, announced that he was a police officer and managed to gain entrance to the apartment. Hodgman continued to try to shut the door, catching Officer Schwarz half in and half out of the apartment. Officer Schwarz and the other agents forced the door open and rushed inside. Officer Headricks went into the apartment's only bedroom. Officer Schwarz and one other officer held Hodgman on the floor and handcuffed him. Another officer held Ferguson against a wall. Other officers told Greenwalt to "freeze." After all these officers were in the apartment, gunfire was heard from the bedroom.

Officer Headricks' .38 revolver and appellant's .380 automatic handgun had each been emptied. Appellant sustained one wound in his buttocks. Deborah Johnson, who had been lying on the bed, was struck in the thigh by a bullet, rolled off the bed, and crawled into the bedroom closet. Ferguson was struck in the head by a bullet that came through the bedroom wall. Officer Headricks was hit by approximately five bullets; he came out of the bedroom, mumbled something like "he's down" and collapsed in the living room. Three officers then entered the bedroom while others summoned emergency assistance. All four victims were transported to hospitals for medical care. Officer Headricks died of his wounds.

At trial, the state's theory was that appellant knew that "Brian the chemist" was a police officer before the shooting began. Appellant argued that he simply thought "Brian the chemist" was stealing the heroin and that when "Brian the chemist" came at him with a gun, he acted in self-defense by shooting. There was considerable evidence presented concerning the position each man was in when each shot was fired and concerning which shot inflicted which wound. A three-dimensional mock-up was prepared for trial and was utilized by several witnesses to explain their positions during the shootout and to graphically depict the suspected bullet pathways.

On appeal appellant raises eleven issues:

1. Whether there is sufficient evidence to support appellant's conviction;

2. Whether the admission of evidence concerning appellant's prior drug dealing constitutes reversible error;

3. Whether the admission of evidence concerning appellant's "premeditation" constitutes reversible error;

4. Whether the admission of testimony regarding Terry Bush's inferences from statements made by appellant constitutes reversible error;

5. Whether the trial court committed reversible error by denying appellant's motion and refusing appellant's jury instruction concerning the legality of the police entry into the apartment;

6. Whether the denial of appellant's motion to suppress constitutes reversible error;

7. Whether the admission of certain medical evidence violates appellant's physician/patient privilege and constitutes reversible error;

8. Whether certain rebuttal testimony and the prosecutor's conduct in connection therewith constitute reversible error;

9. Whether the refusal of a particular jury instruction on self-defense constitutes reversible error;

10. Whether appellant's post-verdict motion for change of judge was properly denied; and

11. Whether appellant's sentence is excessive.

## SUFFICIENCY OF THE EVIDENCE

At the close of the state's case, appellant moved for a directed verdict of acquittal. At the close of all the evidence, he renewed that motion. Both were denied. After the jury verdict, he moved for a new trial. This motion was also denied. Appellant now submits that there is insufficient evidence to sustain his conviction and that this Court should grant him a new trial or order his acquittal. We decline to do either.

■ Ariz.R.Crim.P. 20(a) provides that a criminal defendant is entitled to a judgment of acquittal only "if there is no substantial evidence to warrant a conviction." Thus, a trial court has no duty to direct an acquittal where there is substantial evidence that a defendant has committed the crime charged, and an acquittal should not be directed if the evidence is such that reasonable minds may differ on the inferences to be drawn therefrom. *State v. Mosley*, 119 Ariz. 393, 581 P.2d 238 (1978). Similarly, a motion for a new trial can be granted upon a showing that the verdict was against "the weight of the evidence." Ariz.R.Crim.P. 24.1(c)(1). A denial of a motion for new trial will be reversed only when there is an affirmative showing that the trial court abused its discretion and acted arbitrarily. *State v. Watkins*, 126 Ariz. 293, 614 P.2d 835 (1980). The test utilized to determine insufficiency of evidence is whether there is substantial evidence to support the guilty verdict. *State v. Clow*, 130 Ariz. 125, 634 P.2d 576 (1981). Because we find substantial evidence to support the verdict in this case, we find no error in the trial court's denial of appellant's motion for acquittal or his motion for a new trial.

■ In reviewing the evidence, this Court does not reweigh the evidence to decide whether we would reach the same conclusion as the trier of fact. *State v. Long*, 121 Ariz. 280, 589 P.2d 1312 (1979). Rather, we view the evidence in the light most favorable to sustaining the verdict and resolve all reasonable inferences against the defendant. *Id.* We must determine that there was sufficient evidence so that a rational trier of fact could have found guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Tison*, 129 Ariz. 546, 633 P.2d 355 (1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). If reasonable men could differ as to whether the evidence establishes a fact in issue, that evidence is substantial. *State v. Bearden*, 99 Ariz. 1, 405 P.2d 885 (1965).

■ In the case before us, appellant does not deny engaging in the shootout with Officer Headricks on October 28, 1974. He only claims that he acted in self-defense, protecting himself from a drug "rip-off." Thus, the critical question for the jury was whether appellant, at the time of the shooting, knew the true identity of "Brian the chemist." The state presented considerable evidence which could have led the jury to find that appellant was aware that "Brian the chemist" was actually a police officer. First, as noted in the statement of facts, *supra*, after Ferguson left appellant's apartment to get Officer Headricks, Hodgman told appellant that Ferguson looked like someone who had been following him. There was testimony that Hodgman referred to Ferguson as a "narc" and that appellant was upset by Hodgman's statements. Second, also as noted in the statement of facts, Hodgman and Greenwalt went out of the apartment on "reconnaissance" to allay their fears that Ferguson was a "narc." When Hodgman reported back to appellant, Hodgman described the people with whom Ferguson was meeting as "suspicious." Appellant's response was that they "better not be pigs." On Hodgman's second reconnaissance trip, he

was seen by the police officers to look around the parking lot and then quickly go back into the apartment complex. Third, after Officer Headricks had tested the heroin and left to get his money man and the other Metro agents but before they had returned, appellant telephoned a friend, Bush, who lived on the opposite side of the same apartment complex. In response to appellant's call, Bush went outside his apartment and was observed by Officer Bright to look up and down the street. Bush testified that, when he looked outdoors, he was looking for "police or anybody that looked like them." Fourth, there was evidence presented that appellant took a potentially fatal dose of heroin shortly before his confrontation with the police. Fifth, there was considerable evidence presented concerning the noise the officers made as they forced the door open and entered the apartment. Appellant himself testified that he heard the crash at the door. Several of the officers testified that, at the time, they were shouting "police," "police officer," or other similar announcements. A resident of the apartment across the hall from appellant testified that she heard loud voices and shouting and then a loud crash. From all of this evidence, the jury could have reasonably inferred that appellant's suspicions were raised by Hodgman's statements that Ferguson had been following him and was possibly a "narc." The jury could have also inferred that appellant's suspicions were heightened or confirmed as a result of Hodgman's reports following his reconnaissance trips and that appellant's call to Bush was evidence of his knowledge. They could have inferred that appellant, presuming that "Brian the chemist" was a police officer, took a large dose of heroin to fortify himself for the upcoming confrontation. Lastly, the jury could have inferred that appellant heard the shouts outside his apartment door and those inside his living room from the several police officers present. We do not find any of these inferences unreasonable. Therefore, we find that there was substantial evidence to support the jury's

guilty verdict. There was no error in the trial court's denial of appellant's motions.

## PRIOR DRUG DEALING

During his testimony on direct examination, appellant admitted that he had a long history of narcotics addiction, that he had sold heroin to Ferguson at some earlier time, and that he was involved in a heroin sale at the time the shooting of Officer Headricks occurred. However, appellant moved in limine to preclude the state from introducing any other evidence of prior drug dealing. The trial court denied that motion.

■ Generally, evidence of other wrongs is not admissible to show that a defendant is a bad person or has a propensity for committing crimes. *State v. McCall*, 139 Ariz. 147, 677 P.2d 920 (1983). However, such evidence may be admitted for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or to complete the story of the crime. *Id.*

In *Mincey II*, this Court specifically addressed the admissibility of appellant's previous drug dealing. There, we held that the evidence was

"helpful to a determination of motive, intent, knowledge or absence of mistake or accident by establishing the background in which were set the events culminating in the shooting. We also believe the evidence was admissible to complete the story of the crime."

130 Ariz. at 404–05, 636 P.2d at 652–53. Appellant argues that this former ruling should not be applied to the third trial because there were no drug charges before the third jury. Appellant's argument is apparently premised on the notion that this Court, in *Mincey II*, held the evidence admissible only because of the presence of the drug charges. That notion is not correct.

■ The complained-of evidence was properly before the jury in the third trial even without the drug charges. As noted above, the primary factual issue for the

jury was to determine whether appellant was aware of the true identity of "Brian the chemist." A person who deals in illicit drugs over an extended period of time has more reason to know of the likelihood of a drug rip-off or of an undercover police officer infiltrating his operation than a person who merely sells drugs occasionally or who merely uses drugs. From appellant's direct testimony, the jury knew only that appellant himself was a heroin addict, that he had sold two ten-dollar doses of heroin to Ferguson, and that he was an active participant in the heroin sale of October 28, 1974. This was an incomplete description of appellant's experience in the illicit drug market. Thus, the cross-examination of appellant, which brought out that he had been dealing drugs for at least several months, that he had many regular customers, that he was aware the police frequently used "snitches," and that the worst thing that could happen to him was to get busted, was important evidence completing the story for the jury. It was also relevant to appellant's knowledge, intent, and motive and, thus, was properly admitted under Ariz.R.Evid. 404(b).

■ We acknowledge that appellant was entitled to a cautionary or limiting instruction on the weight and use that the jury should have ascribed to this evidence. We also note that the trial court gave appellant several chances to provide such an instruction, but that appellant failed to do so. There was no error. *See State v. Martinez,* 121 Ariz. 62, 588 P.2d 355 (App. 1978); *State v. Reed,* 25 Wash.App. 46, 604 P.2d 1330 (1979).

### "PREMEDITATION" EVIDENCE

Prior to trial, appellant moved to preclude the state from introducing into evidence several matters which he insists are only relevant to a determination of whether the murder of Officer Headricks was premeditated. His motion was denied. He now asserts that this denial was error. We disagree.

■ Four elements of evidence are at issue: testimony that appellant wanted to cut down a shotgun so that he could retaliate if he was ever "hassled by pigs," testimony that appellant wanted to adapt a semi-automatic weapon to make it shoot faster so that he could respond if harassed, testimony concerning Hodgman's and Greenwalt's "reconnissance" trips, and testimony concerning appellant's overdose of heroin just prior to his confrontation with Officer Headricks. Appellant contends that each of these are irrelevant to the charge of second-degree murder and would only be relevant to a first-degree charge. Because he was acquitted of first-degree murder in his second trial, he argues that the mere introduction of this evidence violated the double jeopardy provisions of the fifth amendment.

The statute under which appellant was convicted, former A.R.S. § 13–452, provided:

"A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate or premeditated killing, or which is committed in avoiding or preventing lawful arrest or effecting an escape from legal custody, or in the perpetration of, or attempt to perpetrate, arson, rape in the first degree, robbery, burglary, kidnapping, or mayhem, or sexual molestation of a child under the age of thirteen years, is murder of the first degree. All other kinds of murder are of the second degree."

"Murder" was defined in former A.R.S. § 13–451(A) [repealed by 1977 Session laws, ch. 142, § 15] as follows:

"Murder is the unlawful killing of a human being with malice aforethought."

"Malice aforethought" was defined in former A.R.S. § 13–451(B) [repealed by 1977 Session laws, ch. 142, § 15].

"Malice aforethought may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears or when the circum-

stances attending the killing show an abandoned and malignant heart."

Under our old Criminal Code, malice aforethought was, thus, an essential element of both first- and second-degree murder. For a first-degree conviction, the state also had to prove premeditation and deliberation. *State v. Singleton,* 66 Ariz. 49, 182 P.2d 920 (1947).

■ While we agree that the complained-of evidence could be relevant to premeditation, *see Mincey II* 130 Ariz. at 406, 636 P.2d at 654 ("The testimony * * * bore directly on the issues of intent and premeditation * * *."), it is not thereby irrelevant to lesser offenses. We have said that the malice necessary for a second-degree murder conviction is "the intent to kill without legal justification," *State v. Brock,* 101 Ariz. 168, 172, 416 P.2d 601, 605 (1966). In the language of the statutory definition, *supra,* express malice aforethought is manifested by a "deliberate intention unlawfully to take away the life of a fellow creature." We feel that the testimony that appellant wanted to cut down a shotgun "in case he ever get hassled by pigs," that appellant said he would use the sawed-off shotgun to "kill a pig if they get in my way," and that appellant wanted to make a semi-automatic weapon fully automatic in case anyone harassed him is relevant to the question of whether appellant had the "deliberate intention" to unlawfully take the life of a fellow human being. Thus, this evidence was properly admitted in appellant's second-degree murder trial. The remaining complained-of evidence, that Hodgman and Greenwalt went on "reconnaissance" trips and that appellant apparently took an overdose of heroin just before the shootout, also does not solely relate to the issue of premeditation. Rather, the evidence directly relates to the critical issue of whether appellant knew the true identity of "Brian the chemist." Thus, it too was properly admitted in appellant's second-degree murder trial.

We do not find any violation of appellant's double jeopardy protections. Appellant was acquitted of first-degree murder and convicted of second-degree murder at his second trial. This Court reversed his second-degree murder conviction in *Mincey II.* At his third trial, appellant was charged only with second-degree murder, tried only for second-degree murder, and convicted only of second-degree murder. He was not, as he claims, "essentially retr[ied]" for first-degree murder.

## INFERENCES FROM APPELLANT'S STATEMENTS

■ Terry Bush was the person from whom appellant obtained the heroin he attempted to sell to Officer Headricks on October 28, 1974. After Officer Headricks had tested the heroin and left the apartment to get Officer Schwarz and the other Metro agents, appellant telephoned Bush. Appellant testified that he called Bush to have him look outside to see if he could determine why "Brian the chemist" was taking so long to come back to the apartment with his money man. Bush testified that appellant told him to "look outside and see what I could see," but that appellant did not tell him to look for anyone in particular. Bush did go outside of his apartment and was observed by Officer Bright to look up and down the street. When Bush returned to the telephone to report his findings to appellant, the line was dead. When asked at trial what or whom he was looking for when he went outside, Bush at first indicated that he had looked for "anyone hanging around out there," but later acknowledged that he had looked for "police and anybody that looked like them." When asked why he looked specifically for police officers, Bush indicated that, though appellant had not made that specific inquiry, the only people for which he thought to look were police officers. Appellant does not object to the trial court having allowed Bush to testify to appellant's request that Bush look outside. He does object, however, to the trial court having allowed Bush to "speculate as to what he, Bush, thought appellant meant by his directions to him." We find that the trial court did not allow such speculation and that there was no error.

At one point during Bush's testimony, the prosecutor referred Bush to a prior statement and the following transpired:

"Q. [by the prosecutor]: Following that question [reading from the prior statement], 'Okay, and who were you looking outside for? Answer: For the police or anybody that looked like them. Question: Do you—that was the meaning you got from the conversation? Answer: Yes, sir.'

"[Defense counsel]: I will object to that, your Honor.

"The Court: Sustained.

"[Defense counsel]: I would ask that be stricken and the jury be admonished.

"The Court: It is ordered stricken and the jury is ordered to disregard the last question and answer read to them."

The jury was again reminded in their jury instructions to disregard testimony stricken from the record. Thus, the trial court did not allow Bush to speculate as to what appellant meant or implied by his request. The trial court only allowed Bush to testify as to what he (Bush) actually did look for.

This evidence is perhaps illuminating of Bush's state of mind at the time, but does not necessarily imply that appellant shared that state of mind. Indeed, both Bush and appellant repeatedly testified that appellant never mentioned the police to Bush during the telephone conversation in question. Bush also testified that appellant did not restrict for what or whom Bush was to look but rather that Bush himself had narrowed his search. The trial court properly left it to the jury to draw its own conclusion as to what appellant meant in his conversation with Bush.

### LEGALITY OF ENTRY

■ Appellant maintains that Officer Headricks failed to comply with the provisions of former A.R.S. § 13–1411 [now A.R.S. § 13–3891]:

**"Right of officer to break into building**

"An officer, in order to make an arrest either by virtue of a warrant, or when authorized to make such arrest for a felony without a warrant, as provided in § 13–1403, may break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if the officer is refused admittance after he has announced his authority and purpose."

The usual remedy for failure to comply with this statute is suppression of evidence seized following the wrongful entry. *See, e.g., State v. Cook,* 115 Ariz. 188, 564 P.2d 877 (1977). However, appellant instead asked the trial court to preclude all evidence of and argument concerning the legality of Officer Headricks' entrance into the apartment.[2] Had appellant's motion been granted, evidence would have been suppressed concerning whether Officer Headricks said "police" or something similar to Hodgman before he entered the apartment. Because appellant did not seek to suppress any physical evidence seized as a result of the allegedly illegal entry and, indeed, used the seized evidence as part of his defense, the real issue before this Court is whether the trial court abused its discretion in failing to grant appellant the extraordinary relief he requested. Even if the trial court had found non-compliance with the statute, it was not required to grant the requested relief. The evidence sought to be suppressed is clearly relevant. As noted *supra,* the critical issue for the jury in the third trial was whether appellant knew the true identity of "Brian the chemist." While obvious compliance would have made easier a finding that appellant knew that Officer Headricks was a police officer, given that there was testimony that appellant was in the bedroom at the time an announcement would have been made, it would not have been conclusive thereof. Likewise, non-compliance with the statute

2. Appellant does not argue that Officer Headricks' initial entry (when he met appellant and tested the heroin) was illegal. Nor does appellant argue that the entry of any of the other Metro agents was illegal. Appellant only asserts that Officer Headricks' second entry (when he had the other Metro agents behind him and when he made his way past John Hodgman at the door) was illegal. "Entry" in this section indicates only this challenged second entry.

does not negate the possibility that appellant had actual knowledge of Officer Headricks' identity. We find no abuse of discretion in the trial court's denial of appellant's requested extraordinary relief. Therefore, we will not disturb the ruling.

■ Appellant further argues that the trial court committed reversible error when it refused to give the following jury instruction:

"You are instructed that any announcement by Officer Headricks prior to entering defendant's apartment was not legally sufficient and, therefore, his entry was unlawful. Therefore, his attempted arrest of the defendant was an unlawful arrest. You need not consider the legalities of the activities of the other officers in this case as far as the entry and arrest is concerned."

Appellant offers two reasons why the failure to give this instruction constitutes reversible error: (a) that it deprived him of a significant aspect of his defense, and (b) that "it was important for the jury to know that * * * Officer Headricks did not comply with the knock and announce statute."

As to the latter reason, we reiterate that whether Officer Headricks properly complied with the statute was not determinative of whether appellant knew his true identity. Thus, whether the announcement was legally sufficient to meet the requirements of A.R.S. § 13–1411 was not vital knowledge for the jury.

As to the former, appellant sets forth the following analysis. He submits, citing *Lawrence v. State*, 29 Ariz. 247, 240 P. 863 (1925), that the law in Arizona in 1974 was that an individual had the right to use force to rebut deadly force exerted by an officer attempting to make an illegal arrest. Therefore, the analysis continues, to not tell the jury that the arrest was illegal deprived appellant of a significant aspect of his case and reversal is mandated. *State v. Celaya*, 135 Ariz. 248, 660 P.2d 849 (1983). Initially, we note that the requested jury instruction would only have informed the jury that Officer Headricks' entry and attempted arrest were illegal.

Neither it nor any other requested jury instruction would have told the jury that appellant therefore had a right, solely because of an attempted illegal arrest, to use deadly force against Officer Headricks. The requested jury instruction was, thus, incomplete and the trial judge had no duty to give it. Furthermore, rather than augmenting appellant's defense theory, the argument that appellant was properly resisting an illegal arrest is inherently inconsistent with his own testimony that he did not know that "Brian the chemist" was a police officer in his apartment to arrest him. Instructions must be predicated on some theory of the case found in the evidence. *State v. McIntyre*, 106 Ariz. 439, 477 P.2d 529 (1970). There was no error in the trial court's refusal of the instruction.

## MOTION TO SUPPRESS

Prior to trial, appellant moved to suppress all physical evidence, photographs, and measurements taken in a warrantless search of his apartment. The motion was denied. Appellant acknowledges that this Court held in *Mincey II* that all the non-drug related photographs and the measurements could properly be admitted. He urges us, however, to reverse *Mincey II* on that point and to now rule that all of the evidence should have been suppressed. We refuse to do so. The non-drug related evidence was properly admitted.

In addition to his general objection, appellant specifically objected to the admission, even for impeachment purposes, of three photographs of his bedroom. Each of these three photographs showed a syringe lying on a table. In *Mincey II* we held that these and other photographs of drug paraphernalia had been obtained in violation of appellant's fourth amendment rights and that they should have been suppressed.

During cross-examination of appellant, the following transpired:

"Q. [by the prosecutor]: Did you have a syringe in your bedroom?

"A. There's one shown on the picture, yes, sir.

"Q. Did you use that syringe?

"A. I don't know.

"Q. You testified previously that that's the one you used.

"A. I don't know.

"Q. [Two of the photographs] are in evidence. Is there a syringe on the table?

"A. Yes, sir.

"Q. Did you use that syringe just before the officers got there?

"A. Just before the officers got there?

"Q. Right.

"A. No, sir.

"Q. [The third photograph], was that the syringe?

"A. Yes, sir.

"Q. The one shown in this picture right here?

"A. Yes, sir.

"[The prosecutor]: Offer [the third photograph]."

The United States Supreme Court, in *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), held that evidence suppressed as the fruit of an unlawful search may nevertheless be used to impeach a defendant's false testimony even where the evidence does not squarely contradict the defendant's testimony on direct examination. The Court held that:

"a defendant's statements made in response to *proper* cross-examination reasonably suggested by the defendant's direct examination are subject to *otherwise proper* impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt."

446 U.S. at 627–28, 100 S.Ct. at 1917, 64 L.Ed.2d at 566 (emphasis added). The critical questions, therefore, are whether the prosecutor was engaged in proper cross-examination and whether the attempted impeachment was otherwise proper.

 In this state, cross-examination may extend to all matters covered by direct examination and to any other matter within the knowledge of the witness which has relevance to the issues at trial. *State v. Jones,* 109 Ariz. 378, 509 P.2d 1025 (1973). Given that part of the state's theory was that appellant took an injection of heroin to fortify himself prior to the confrontation with the police, the above-quoted testimony was arguably relevant and was proper cross-examination.

 Impeachment evidence generally attacks the credibility of a witness; it is not a process whereby substantive evidence is adduced. *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 619 P.2d 1032 (1980). The above-quoted testimony did not attack appellant's credibility. Nor did it contradict his or anyone else's testimony. If, for example, appellant had answered negatively to the question of whether he had a syringe in his bedroom, the photographs would have been allowed into evidence to impeach that testimony. Similarly, if the photographs somehow indicated the time the syringe had been used, and appellant testified that it had never been used, impeachment with the photographs would have been proper. However, here, the impeachment evidence had no impeachment value. Rather, it was in the nature of substantive evidence. Having used the photographs to demonstrate that a syringe was in the same room as appellant, the prosecutor argued to the jury that appellant, somehow knowing the true identity of "Brian the chemist," overdosed with heroin to ready himself for the confrontation with police. This was not proper impeachment. Therefore, the second *Havens* requirement was not met. The state has urged no other rationale by which admission of the photographs would have been proper. We must, therefore, hold that the admission of the photographs was error.

 However, we also hold that the error was not prejudicial. The test for determining reversible error is whether, absent the error, we can say beyond a reasonable doubt that the jury would have found appellant guilty. *State v. Corrales,* 138 Ariz. 583, 676 P.2d 615 (1983). There was considerable other evidence from which the jury could have concluded that appellant

took a large dose of heroin just before the shootout with Officer Headricks.[3] Appellant has not demonstrated the prejudice required for this Court to mandate reversal.

## PHYSICIAN/PATIENT PRIVILEGE

▮ Appellant asserts that none of the physicians who treated him after he was shot should have been allowed to testify at the third trial because of the physician/patient privilege granted by A.R.S. § 13–4062(4). The state responds that whatever privilege existed was waived by appellant's failure to object to the physician's testimony at his first two trials. We agree that appellant's privilege had been waived prior to the third trial.

▮ A.R.S. § 13–4062(4) provides that: "A physician or surgeon, without the consent of his patient, [shall not be examined] as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

We have held that, in civil trials, a patient can waive his privilege by failing to properly object at trial. *Throop v. F.E. Young & Co.*, 94 Ariz. 146, 382 P.2d 560 (1963). We now hold that the same is true in criminal cases.

In appellant's prior trials, Drs. Burnell M. Brown, Jr. and Martin E. Silverstein testified regarding appellant's gunshot wound as well as his condition upon arrival at the emergency room and during his convalescence. In the earlier trials, each of the physicians was called by the state and appellant did not object to their testimony on the basis of privilege. By his failure to object, he waived his privilege. The next

issue is whether, having waived the privilege in an earlier trial, he could reassert it in his third trial.

▮ The primary purpose of the physician/patient privilege is to protect communications made by a patient to his or her physician for the purpose of treatment. *State v. Santeyan*, 136 Ariz. 108, 664 P.2d 652 (1983). All information obtained by the physician, whether from examination, testing, or direct communication, is protected. *Id.* However, once the privilege is waived, the confidentiality sought to be protected is merely a legal fiction. We therefore hold that, once waived, whether at a former trial or otherwise, a patient cannot reassert his or her privilege.

We find considerable support for this holding.

"A waiver at a *former trial* should bar a claim of the privilege at a later trial, for the original disclosure takes away once and for all the confidentiality sought to be protected by the privilege. To enforce it thereafter is to seek to preserve a privacy which exists in legal fiction only."

8 Wigmore, *Evidence* § 2389(4) at 860–61 (McNaughton rev. 1961) (emphasis in original). *See also* McCormick, *Handbook of the Law of Evidence* § 102 at 218 (2d ed. 1972) ("If [the patient] is in a position to claim [the privilege] and does not, it is waived * * *."). In *State v. Bishop*, 187 N.J.Super. 187, 453 A.2d 1365 (A.D.1982), the court was faced with a situation analogous to the instant matter. In that case, a witness had testified at defendant's first trial thereby waiving his right against self-incrimination. At defendant's second trial, the witness sought and was allowed to

**3.** Two paramedics that attended appellant at the scene testified that they had seen numerous drug overdose cases, that they were familiar with the signs and symptoms of such cases, and that appellant's signs and symptoms were consistent with those of a drug overdose. Further, the physicians that treated appellant in the emergency room testified as to his condition upon arrival there. They explained appellant's gunshot wound and the signs and symptoms it could produce. They also testified concerning narcotics overdose and the signs and symptoms associated therewith. They told the jury when, after injection, heroin reaches its peak effects and what duration it typically has. They then described appellant's physical signs and symptoms as well as his reaction to a particular drug, narcan, which has a certain effect in the presence of narcotics but which, in the absence of narcotics, has essentially no pharmacologic activity.

invoke his fifth amendment privilege. On appeal, it was held that the trial judge erred in permitting the invocation of the privilege. The court stated:

It is perfectly clear that once privileged material is disclosed, the privilege of non-disclosure is waived. It is equally clear that the waiver is irrevocable once a witness answers a question without claiming the privilege and [that the waiver] continues in effect for all subsequent proceedings."

*Id.* at 192, 453 A.2d at 1368 (citations omitted). *See also In re Grand Jury Proceedings,* 604 F.2d 804, 805 (3d Cir.1979) ("Once waived, [a] privilege cannot be asserted at a later date.").

Appellant urges that *Arizona Eastern Railroad Co. v. Matthews,* 20 Ariz. 282, 180 P. 159 (1919) mandates the opposite result—that waiver at one trial should not foreclose use of a privilege at a subsequent trial. In *Arizona Eastern,* this Court interpreted the privilege granted in civil cases and stated:

"It seems * * * the patient can object to the physician testifying as to what he may have learned in his professional capacity unless the patient has himself *testified to the communications he made to the physician.* It not appearing that appellee testified to any communication made by him to the physicians, he did not waive his right to object to their testifying at the second trial, even though they did at some previous trial testify as to knowledge obtained by personal examination."

*Id.* at 294, 180 P. at 164 (emphasis in original).[4] Initially we note that this language is mere dictum in *Arizona Eastern.* We also note that the statute interpreted, Civil Code 1913, § 1677(6), provided, after stating the privilege, that if the patient offered himself as a witness and voluntarily testified regarding the communications, such testimony was deemed to be consent to the testimony of the physician. No other

method of waiver was provided and, under the doctrine of *expressio unius est exclusio alterius,* none other would have been presumed. However, neither the current civil privilege (A.R.S. § 12–2235) nor the current criminal privilege (A.R.S. § 13–4062(4)) contains any language limiting the methods by which a patient might waive his privilege. We will not imply such a limitation. Because of the change in the statutory language since 1919, *Arizona Eastern* is not controlling in our interpretation of the current statutes. Appellant's failure to object at his first two trials resulted in waiver of his physician/patient privilege. That privilege could not have been reasserted in the third trial.

## REBUTTAL TESTIMONY

During the state's case-in-chief, Paul Larmour, a mechanical engineer who specializes in forensic work and reconstruction, testified. Larmour had been retained by the state to examine appellant's apartment and to determine bullet pathways and possible shooter positions. He was dependent on the state for information concerning where the bullet fragments had been found in the apartment, who had fired which shots, and for measurements of items no longer in the state's possession. He relied on appellant's former testimony, in conjunction with his plotting of the bullet pathways, to determine the possible shooter positions for each shot fired. Larmour testified that he only had received a portion of appellant's former testimony and, from that portion, had formed certain impressions concerning appellant's position when he fired each shot. After defense counsel had read Larmour other passages of testimony and asked if those would change his opinion, the state asked Larmour if he would be willing to read the entirety of appellant's testimony from the first two trials and then testify again regarding shooter positions. Larmour agreed. Later

---

**4.** This language has puzzled even the most able of commentators. *See* M. Udall and J. Livermore, *Arizona Practice: Law of Evidence* § 71 at 129 (2d ed. 1982) (After noting this protection of the privilege, the authors stated: "To us this defies rational explanation. It is impossible to understand what it is that the court was protecting.").

called as a rebuttal witness, Larmour indicated that there was some ambiguity in appellant's testimony regarding his position when he fired his first shot. If, as appellant insists, he was in one position when the first shot was fired, the bullet pathways established by Larmour are consistent with appellant's testimony. If, on the other hand, appellant was in another position suggested by his testimony, the bullet pathways would be inconsistent with appellant's version of the shootout.

▉▉▉▉ Appellant now argues that the state provided Larmour with incorrect information on which Larmour based his conclusions and his testimony and likens this to the prosecutorial misconduct which mandated reversal in *State v. Holsinger*, 124 Ariz. 18, 601 P.2d 1054 (1979). In *State v. Holsinger*, the prosecutor mentioned the defendant's "long criminal record" while questioning a key state's witness. We noted that such "other bad act" evidence may only be admitted under certain conditions and also that the defendant in that case did not truly have a long criminal record. We found such questioning to be quite prejudicial and to constitute reversible error. We find no comparable prejudice here. When Larmour was testifying on rebuttal, he had fully read all of appellant's prior testimony. Indeed, it was because appellant had challenged Larmour's opinions founded on his reading of only limited testimony that Larmour had read all of appellant's testimony and was testifying a second time. Larmour's testimony allowed the jury to see physical demonstrations of the positions appellant would have had to have been in if his testimony was to be believed. An expert may testify as to an opinion if his or her specialized knowledge will assist the factfinder in understanding the evidence. Ariz.R.Evid. 702. The determination of whether an expert's opinion will so help the jury is a matter within the sound discretion of the trial court. *State v. Williams*, 132 Ariz. 153, 644 P.2d 889 (1982). We will not disturb the trial court's determination absent a clear abuse of discretion. *Id.* Larmour's testimony was premised on his reading of appellant's former testimony

and was subject to vigorous cross-examination. If Larmour placed appellant in a position contrary to that which appellant himself described, the jury could have realized that and given Larmour's testimony less weight. There was no abuse of discretion in the trial court's admission of the challenged testimony.

## JURY INSTRUCTIONS

▉▉▉▉ Appellant claims that the trial court's refusal to give the following jury instruction constitutes reversible error:

> "Rufus Mincey must be found not guilty if you find that Barry Headricks, in attempting to make an arrest, by some act of his own, put the life of the Defendant in danger, or did that which could cause the Defendant great bodily injury, or did some acts in making or attempting to make the arrest such as would warrant an apprehension in the Defendant's mind that his life was in danger, or that great bodily harm would come to him."

Taken down to its essential elements, this jury instruction would have told the jury that appellant "must be found not guilty if * * * Barry Headricks, in attempting to make an arrest, * * * put [appellant's] life * * * in danger [or] did some acts * * * [which] would warrant an apprehension in [appellant's] mind that his life was in danger * * *," and would have implied that a police officer cannot use or threaten to use any force in making an arrest without thereby giving the arrestee "permission" to use deadly force. This is an incorrect statement of the law and, therefore, was properly refused by the trial court. *State v. Britson*, 130 Ariz. 380, 636 P.2d 628 (1981). A police officer has the right to use force when making an arrest; he simply cannot use excessive force. Former A.R.S. § 13–1401 [now A.R.S. § 13–3881]; *see State v. Martinez*, 122 Ariz. 596, 596 P.2d 734 (App.1979).

▉▉▉▉ The jury was correctly instructed that:

> "A person may not resist by the use of force or violence a police officer in the

performance of his duty knowing that person is a police officer, so long as the police officer does not use excessive force."

Despite the giving of this instruction, appellant argues that the jury was never told that, if Officer Headricks used excessive force, appellant could have responded with force. Beyond the fact that the rejected instruction, *supra*, would not have so informed the jury, we find that the above-quoted instruction that was given adequately explained the law to the jury. If the jury had found that appellant knew the true identity of "Brian the chemist," but had also found that Officer Headricks had unnecessarily fired his gun first or had otherwise used excessive force, they knew that appellant would have been justified in using force or violence against Officer Headricks and they could have acquitted appellant.

■ Also, if the jury found that appellant did not know the true identity of "Brian the chemist" and was merely responding in self-defense to a drug theft, we hold that the several self-defense instructions that were given adequately instructed the jury on self-defense.

There was no error in the jury instructions given or those rejected.

## MOTION FOR CHANGE OF JUDGE FOR CAUSE

Appellant contends that certain statements by the trial judge demonstrated such bias and prejudice that he should not have been allowed to rule on appellant's motion for a new trial or to impose appellant's sentence. Prior to the hearings on the new trial motion and for sentencing, appellant moved for a change of judge for cause. It was denied by the presiding criminal judge after a hearing held pursuant to Ariz.R. Crim.P. 10.1(c).

■ The right to a trial and hearings presided over by a judge who is impartial and free of bias or prejudice is included within the right to a fair trial guaranteed by both the Arizona and the United States Constitutions. *See State v. Neil,* 102 Ariz. 110, 425 P.2d 842 (1967). In order to insure this right, Ariz.R.Crim.P. 10.1(a) provides that:

"In any criminal case prior to the commencement of a hearing or trial the state or any defendant shall be entitled to a change of judge if a fair and impartial hearing or trial cannot be had by reason of the interest or prejudice of the assigned judge."

It is the burden of the moving party to establish the truth of his or her allegations. *State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105 (1983).

The events leading up to appellant's motion for change of judge for cause are as follow. The jury verdict against appellant was rendered on May 28, 1982. Sometime during the next seven to ten days, in an informal conversation between the trial judge and representatives of the media, the subject of appellant's sentencing arose. The trial judge apparently remarked that appellant had been sentenced twice before (following the first and second jury trials) and that he was uncertain whether he could impose a different sentence on appellant than had the two prior sentencing judges. The trial judge also apparently made remarks to the effect that he felt the jury verdict could have gone "either way" and that he would not sit as the "37th juror" and find appellant not guilty. After this conversation but prior to June 11, 1982, one of the media representatives, Ms. Wyerman, told defense counsel of her conversation with the trial judge. On June 28, 1982, defense counsel asked Wyerman and a second reporter, Mr. Humes, about their conversation with the trial judge. That afternoon, defense counsel met with the trial judge and the prosecutor to discuss their concern over what they had heard from the reporters. The trial judge acknowledged the informal conversation and also that various people had mentioned to him how difficult the sentencing process would probably be. No court reporter was present during this meeting. After hearing that appellant and appellant's counsel had doubts regarding his ability to indepen-

dently determine sentence, the trial judge agreed to recuse himself from appellant's sentencing. He also stated, however, that he would hear the motion for new trial because, given that the only issues raised were sufficiency of the evidence and failure to give a particular jury instruction, he felt that he (as trial judge) was in the best position to make the new trial determination. There were apparently no objections to this arrangement. The new trial motion was to be heard on June 30, 1982. When the matter was called, defense counsel stated:

> "Your Honor, in light of recent occurrences in this case, the Court's statements in this case, and the decision that it would recuse itself from sentencing, if we are going to go ahead with the motion for a new trial, I don't think we have any alternative under Rule 10.1 than to ask the Court to be recused for cause and have that motion set for hearing in front of [the presiding criminal judge]."

After reading appellant's rule 10.1 motion and defense counsel's affidavit regarding bias, the trial judge stated that he disagreed with much of it and that, rather than voluntarily recuse himself, he thought a hearing should be held and all witnesses examined under oath. He withdrew his previous voluntary recusal from sentencing so that another judge could decide the entire matter.

The hearing on the motion for change of judge for cause was heard on July 1, 1982. The trial judge, his secretary, his courtroom clerk, the two reporters involved, and a representative of the Arizona Department of Corrections testified. The presiding criminal judge, after hearing the testimony and the arguments of counsel, found no basis for the motion for change of judge for cause. The motion was denied.

■■■■■ Initially, we hold that appellant's motion for change of judge was untimely and could have properly been denied on that basis. Ariz.R.Crim.P. 10.1(b) clearly provides that:

> "Within 10 days after discovery that grounds exist for change of judge, but

not after commencement of a hearing or trial, a party may file a motion verified by affidavit of the moving party and alleging specifically the grounds for the change."

Defense counsel were first told of the trial judge's complained-of conversation sometime before June 11, 1982. They did not raise their objections orally until June 28th and did not file their motion until June 30th. We have stated that rule 10.1(b) "is properly interpreted to mean that a motion for change of judge for cause is deemed timely filed *only* if filed within ten days after discovery of the grounds for the change," *State v. Myers,* 117 Ariz. 79, 87, 570 P.2d 1252, 1260 (1977), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978) (emphasis added). While we will not allow purely "technical" arguments to constitute waiver of the right to a change of judge, *State v. Valencia,* 124 Ariz. 139, 602 P.2d 807 (1979), the imposition of a time limit by rule of this Court is not just a "technical" requirement. It is a realistic provision necessary for the efficient and prompt determination of allegations of bias.

■■■■■ We also feel that appellant's motion for change of judge for cause was properly denied on the merits. Appellant's first substantive argument was that the trial judge, having indicated that the jury verdict could have gone either way, had acknowledged that he was not certain of appellant's guilt beyond a reasonable doubt. This, coupled with the trial judge's comment that he would not sit as the "37th juror," led appellant to conclude that the trial judge had abdicated his responsibility to order a new trial if he felt there was insufficient evidence to warrant the jury's verdict. We do not believe that appellant's conclusion necessarily follows from the facts before us. As indicated in the "Sufficiency of the Evidence" section, *supra,* there was substantial evidence to support the verdict in this case. The fact that the trial judge indicated that the jury verdict could go either way does not mean that, had he been on the jury, he would have had

reasonable doubt regarding appellant's guilt. Indeed, at the subsequent sentencing hearing, the trial judge told appellant that the jury's guilty verdict "would have been [his] verdict also." We find no error in the presiding judge having allowed the trial judge to hear the motion for new trial.

■ In denying appellant's motion to remove the trial judge from sentencing, the presiding criminal judge found, even at the time appellant's motion for change of judge was heard, that the trial judge had not yet made up his mind on sentencing. There was testimony at the hearing that the trial judge had ordered not only a current pre-sentence report but also the pre-sentence materials available from the first two trials. There was also testimony that the trial judge had spent a considerable amount of time thinking about an appropriate sentence for appellant and that he had consulted with a Department of Corrections representative concerning the actual time that appellant would have to serve if he were given various sentences under the indeterminate sentencing scheme of our former Criminal Code. We feel that, with this evidence, the presiding judge was correct in finding that the trial judge did not feel bound to impose the same sentence that the two earlier judges had decided upon.

■ Appellant's next concern was that the trial judge had received *ex parte* communications from various unnamed, and apparently unknown, parties. The trial judge testified that various people had said that sentencing would be a "tough" decision or that he should be "tough" when sentencing. He also testified as follows:

"But nobody has ever said anything to me as to, you know, what sentence [appellant] ought to receive or why they thought he ought to be, to get—

"Nobody has, in any manner, shape or form indicated what they felt a sentence would be in the case. The only remarks made to me concerning sentencing, you know, you have to be tough, I wouldn't want to do it if it were me."

We do not feel that these communications rise to the level of the objectionable communications of *State v. Valencia, supra.* There, a relative of the victim had a private conversation with the judge prior to sentencing. The relative urged the judge to impose the death penalty and discussed other crimes of which the defendant had been convicted. We held that, having had this conversation with the victim's relative, the judge should have disqualified himself from sentencing. We do not condone or encourage any *ex parte* discussion of sentencing by a trial judge prior to the imposition of sentence and we do not retreat from the holding of *State v. Valencia.* However, in the case before us, we find that the trial judge did not receive any *ex parte* input regarding factual matters or regarding suggested sentences and was not disqualified from appellant's sentencing.

■ Appellant's final contention is that the trial judge's actions constitute violations of the Code of Judicial Conduct and that, based on those violations, the trial judge should not have heard the new trial motion or imposed the sentence. Ariz.R. S.Ct. 45, Canon 3(A)(4) mandates that "[a] judge should * * * neither initiate nor consider *ex parte* applications concerning a pending or impending proceeding." As noted above, we do not feel that appellant has shown that the trial judge either initiated or considered any improper communications. Whatever *ex parte* comments were heard by the trial judge were not sufficient to require disqualification. Ariz.R.S.Ct. 45, Canon 3(A)(6) states that "[a] judge should abstain from public comment about a pending or impending proceeding in any court * * *." Appellant urges that the trial judge's comments to the two reporters constitute a violation of this canon. We hesitate to classify the trial judge's informal conversation with the reporters as "public comment." It was not an interview granted the press, *see United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied sub. nom. Ehrlichman v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Wenger v. Commission on Judicial Performance,* 29 Cal.3d

615, 630 P.2d 954, 175 Cal.Rptr. 420 (1981); *Papa v. New Haven Federation of Teachers*, 186 Conn. 725, 444 A.2d 196 (1982); *Shapley v. Texas Department of Human Resources*, 581 S.W.2d 250 (Tex.Civ.App. 1979), a press conference, or a deliberate distribution to the media of an order of the trial court, *see State ex rel. Commission on Judicial Qualifications v. Rome*, 229 Kan. 195, 623 P.2d 1307, *cert. denied*, 454 U.S. 830, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981). Even if it were public, we agree with the Connecticut Supreme Court that:

> "[i]t does not necessarily follow that if a judge makes any public comments whatsoever about a pending case that he must be disqualified. The act of giving an interview is not per se a basis for recusal. * * * Whether the judge is disqualified by his or her public comments depends on the content of the comments."

*Papa, supra*, 186 Conn. at 747, 444 A.2d at 208. We hold that the comments of the trial judge in this case were not sufficient to mandate his disqualification. We find no error in the presiding judge having denied appellant's motion on its merits.

## EXCESSIVE SENTENCE

 Appellant contends that his twenty-five years-to-life sentence is excessive punishment. He asserts that the trial judge "apparently did not even consider the evidence of appellant's good character and strongly supportive family" in determining appellant's sentence. We have repeatedly stated that sentencing is the responsibility of the trial judge and, absent an abuse of discretion, the sentence will not be altered. *See*, e.g., *State v. Ethington*, 121 Ariz. 572, 592 P.2d 768 (1979); *State v. O'Neill*, 117 Ariz. 343, 572 P.2d 1181 (1977). Several factors are to be taken into account by the trial judge when determining sentencing. Among the relevant factors are the general character of both the offense charged and of the individual convicted, the defendant's age, physical health, cooperative attitude, moral character, prior criminal record or lack thereof, the nature and depravity of the crime, and the degree of the defendant's participation in the crime. *State v. Patton*, 120 Ariz. 386, 586 P.2d 635 (1978). Under former A.R.S. § 13–453(B), punishment for second-degree murder was imprisonment for not less than ten years. The statute did not provide a maximum sentence, so any indeterminate sentence with a minimum of at least ten years was within the statutory prescription. *See State v. Williams*, 103 Ariz. 284, 440 P.2d 311 (1968). Also, there was no requirement under our old Criminal Code that a trial judge articulate his or her reasons for imposing a sentence other than the minimum.[5] The trial judge in this case had presided over a lengthy trial, had observed appellant, and knew of his personal history. He had not only the current pre-sentence report and materials but also the pre-sentence materials from appellant's two prior trials. At the pre-sentence hearing, appellant presented his prison counselor and a prison security guard to testify on his behalf. He also exercised his right of allocution. There is no evidence that the trial judge refused to consider any mitigating evidence or that he abused his discretion in sentencing. The sentence is not excessive.

In addition to examining the issues raised by appellant, we have, pursuant to A.R.S. § 13–4035, searched the entire record for fundamental error. We have found none. The judgment and the sentence are affirmed.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.

---

**5.** Current A.R.S. § 13–702(C) requires the trial judge to make findings of fact on the record when setting other than the presumptive sentence.