IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

CHALICE RENEE ZEITNER, *Appellant*.

No. 1 CA-CR 16-0679
FILED 1-16-2018

Appeal from the Superior Court in Maricopa County
No.  CR2015-000299-001
The Honorable Michael W. Kemp, Judge
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael T. O'Toole
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Mikel Steinfeld
*Counsel for Appellant*

**OPINION**

Judge Diane M. Johnsen delivered the opinion of the Court, in which
Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

**J O H N S E N**, Judge:

**¶1**          Chalice Zeitner was convicted of defrauding the Arizona Health Care Cost Containment System ("AHCCCS") by lying to a physician to obtain coverage for an abortion. On appeal, she argues the superior court breached the physician-patient privilege by admitting her medical records and allowing her physicians to testify against her. We hold the privilege is abrogated by statute in cases of suspected AHCCCS fraud and affirm Zeitner's convictions.

## FACTS AND PROCEDURAL BACKGROUND

**¶2**          Zeitner went to a Phoenix obstetrician for an abortion in March 2010. She told him she just had discovered she was pregnant after recently undergoing extensive radiation and chemotherapy treatments for cancer. Zeitner said she wanted an abortion because she thought the radiation and chemotherapy likely had harmed her fetus. After examining Zeitner, however, the obstetrician concluded she was well-nourished and healthy, about 20 weeks' pregnant and in no acute distress. Accordingly, he proposed a course of care designed to avoid an abortion. He told Zeitner to obtain information from her cancer physicians about her treatments and referred her to a specialist in high-risk pregnancies in the hope that she could deliver a viable baby.

**¶3**          Zeitner met with the specialist a few days later. Examining Zeitner, the specialist grew suspicious. He thought it unusual that, although Zeitner told him she had a diagnosed malignant uterine tumor, the physicians treating her cancer had not removed her uterus. Zeitner told the specialist her main chemotherapy drug was acetaminophen—an over-the-counter pain reliever, not a chemotherapy drug. And Zeitner was unable to relate details of her cancer diagnosis or treatment, other than that she had been diagnosed at a hospital in Boston. From an ultrasound, the specialist saw no abnormalities that compelled an abortion. He reported his concerns about Zeitner's veracity to the obstetrician.

**¶4**          A few days later, Zeitner successfully applied for AHCCCS benefits.[1] AHCCCS had turned down an application Zeitner had submitted

---

[1]          AHCCCS administers Arizona's Medicaid program. *Southwest Fiduciary, Inc. v. Arizona Health Care Cost Containment System Admin.*, 226 Ariz. 404, 406, ¶ 8 (App. 2011). Medicaid is a federal program that funds medical care for qualified low-income individuals in participating states.

just a month before, citing insufficient documentation. Although Zeitner's earlier application had said she had no serious or chronic illnesses, on the application she submitted in late March, Zeitner stated she had a serious chronic illness and said her pregnancy was high-risk and life-threatening.

¶5          On March 31, the obstetrician received an email signed "Al Zeitner" that seemed to be following up on behalf of Chalice Zeitner.[2] Referencing Chalice in the third person, the email stated the author was waiting to hear back from the obstetrician about a "procedure" that he purportedly had proposed. The email suggested the procedure was urgent, stating:

> Chalice is scheduled to resume chemo and radiotherapy on April 9th. She must have the tumors removed in the next 4 weeks. She is on bedrest and supervised care in her home until notice from [the Phoenix obstetrician] of this procedure.

¶6          Shortly thereafter, Zeitner brought the obstetrician a letter dated April 1, purportedly written by a "Dr. McMahon" at the Boston hospital Zeitner claimed had treated her for cancer. The letter recommended that Zeitner "receive an urgent [abortion] . . . to relieve third term life-threatening certainties to the patient." Attached to the letter was a list of chemotherapy and radiotherapy medications purportedly prescribed to Zeitner. (Although a physician named McMahon actually practiced at the Boston hospital at the time, he had never treated Zeitner and had not written the letter or created the list of medications Zeitner gave to him.)

¶7          Accepting the letter as authentic, the obstetrician concluded Zeitner urgently needed an abortion. Based on his opinion that an abortion was necessary to protect Zeitner's health, AHCCCS authorized payment, and the obstetrician aborted Zeitner's fetus on April 9.

¶8          Meanwhile, Zeitner launched a scheme to garner donations from friends and others to fund her purported cancer treatments. Using the name "Trinity McLaughlin," Zeitner sent a social media message to her

_____

*See* 42 U.S.C. §§ 1396 to 1396w-5 (2012). Each participating state administers its own Medicaid program, which must conform to federal requirements. *See*, *e.g.*, Ariz. Rev. Stat. §§ 36-2901 to -2999.57 (2018).

[2]       Unbeknownst to the obstetrician, from time to time Chalice Zeitner used "Al Zeitner" as an alias.

boyfriend, informing him that "Trinity" and a few others had created a webpage to raise funds for Zeitner's cancer treatments and suggesting the boyfriend take over the fundraising effort. The next week, "Trinity" emailed the boyfriend fundraising materials for him to use, including a heartrending plea for donations detailing Zeitner's cancer, her costly painful treatments and her resulting financial hardships.

¶9        Acting on "Trinity's" request, the boyfriend posted on a fundraising website the story "Trinity" had sent him, forwarded "Dr. McMahon's" letter to the website to satisfy its request for proof that Zeitner actually had a medical condition, opened a bank account for donations, and solicited more than 600 social media friends to help pay for the purported cancer treatments. In response, more than 20 people donated a cumulative total of more than $2,000 to Zeitner's cancer fund via the website.

¶10        Several months later, Zeitner became pregnant again, and the Phoenix obstetrician delivered her child by caesarean section. During the procedure, the obstetrician saw no evidence that tumors had been removed from Zeitner's uterus or that she had undergone chemotherapy or radiation. By then highly suspicious about Zeitner's claimed cancer, the obstetrician contacted Dr. McMahon at the Boston hospital, who said he had not treated Zeitner nor authored the letter Zeitner had given him. The obstetrician reported his suspicions about Zeitner to her health plan, which forwarded the matter to AHCCCS.

¶11        A grand jury eventually indicted Zeitner on 11 charges. AHCCCS generally does not cover abortions; the indictment alleged Zeitner defrauded AHCCCS and stole public health benefits by lying about having cancer so that her abortion would fall within an exception to that rule. The State also alleged Zeitner defrauded the donors to her cancer fund, attempted to steal donations and committed identity theft and forgery.

¶12        After pleading not guilty to each of the charges, Zeitner moved to preclude all information her physicians obtained from her, including records relating to her communications with the physicians and their examinations of her, arguing they were protected under Arizona's physician-patient privilege, Arizona Revised Statutes ("A.R.S.") section 13-4062(A)(4) (2018).[3] The State opposed the motions, arguing the privilege

---

[3]        Absent a material revision of a statute since the relevant date, we cite the statute's current version.

was abrogated by statute and, in any event, Zeitner had waived it.  The court denied the motions.

¶13          After an 11-day trial in which the court admitted Zeitner's medical records and allowed her physicians to testify, the jury found Zeitner guilty of all charges.  The court sentenced her to concurrent prison terms, the longest of which was ten years.

¶14          Zeitner timely appealed.  We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1) (2018), 13-4031 (2018) and -4033(A)(1) (2018).

## DISCUSSION

### A.    General Principles.

¶15          On appeal, the only argument Zeitner raises is that the superior court erred by admitting her medical records and allowing her physicians to testify against her.[4]  We review *de novo* whether a privilege applies.  *State v. Wilson*, 200 Ariz. 390, 393, ¶ 4 (App. 2001); *see also State v. Herrera*, 203 Ariz. 131, 136, ¶ 12 (App. 2002) (reviewing *de novo* a statutory exception to a privilege).

¶16          Arizona's physician-patient privilege applicable in criminal cases provides:

> A person shall not be examined as a witness in the following cases:
>
> *     *     *
>
> 4.  A physician or surgeon, without consent of the physician's or surgeon's patient, as to any information acquired in attending the patient which was necessary to enable the physician or surgeon to prescribe or act for the patient.

---

[4]      As explained below, we conclude that the physician-patient privilege does not apply in cases of suspected fraud against AHCCCS. Zeitner does not argue that even if the evidence she challenges was properly admitted to show she defrauded AHCCCS, the jury should not have been allowed to consider that evidence on the other charges against her.

A.R.S. § 13-4062(4). Although the privilege is framed as a testimonial privilege, it also protects patient medical records. *Tucson Med. Ctr. Inc. v. Rowles*, 21 Ariz. App. 424, 427 (1974); *see State v. Mincey*, 141 Ariz. 425, 439 (1984) (privilege protects "[a]ll information obtained by the physician, whether from examination, testing, or direct communication").[5]

**¶17** "The purpose of the [physician-patient] privilege is to encourage 'full and frank disclosure of medical history and symptoms by a patient to [her] doctor.'" *Phoenix Children's Hosp., Inc. v. Grant*, 228 Ariz. 235, 237, ¶ 8 (App. 2011) (quoting *Lewin v. Jackson*, 108 Ariz. 27, 31 (1972)). That purpose is served by protecting "communications made by the patient to [her] physician for the purpose of treatment." *State v. Santeyan*, 136 Ariz. 108, 110 (1983).

## B. Common-Law Exception for Crimes or Frauds.

**¶18** Under a common-law exception to the attorney-client privilege, that privilege does not protect statements a client makes to a lawyer in committing a fraud. *See Buell v. Superior Court*, 96 Ariz. 62, 68 (1964) ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.") (quoting *Clark v. United States*, 289 U.S. 1, 15 (1933)). The State argues the common law similarly constrains the physician-patient privilege.

**¶19** This court already has ruled, however, that no common-law exception for crimes or frauds applies to the physician-patient privilege. *See Wilson*, 200 Ariz. at 395, ¶ 11. The defendant in *Wilson* was charged with workers' compensation fraud, and the State argued the superior court erred by precluding the defendant's treating physicians from testifying about the claimed injury. 200 Ariz. at 392-93, ¶¶ 2-3. As here, the State argued the privilege does not apply when the patient is accused of fraud. *Id.* at 394, ¶ 9. Rejecting that argument, we held that "[i]n the absence of any supporting authority," a fraud allegation, by itself, does not render the privilege ineffective. *Id.* "The state's mere charge of fraud against [the patient] and its alleged need for the otherwise privileged evidence at issue . . . do not

---

[5] *Rowles* involved A.R.S. § 12-2235 (2018), the physician-patient privilege applying to civil cases, 21 Ariz. App. at 427, but its analysis applies to A.R.S. § 13-4062(4). "Because the language of § 12-2235 'is not significantly different from' § 13-4062(4), 'there is no sound reason why the legal interpretation of the statutes should be any different.'" *Wilson*, 200 Ariz. at 397, ¶ 19 (quoting *State v. Santeyan*, 136 Ariz. 108, 110 (1983)).

justify abrogating the privilege or broadly engrafting a common law 'crime-fraud exception' to the privilege in this particular context." *Id.* at 395, ¶ 11.

**¶20**     *Wilson*'s rejection of the asserted common-law exception arose out of the origin of the physician-patient privilege in Arizona. The common-law crime-fraud exception applies to the attorney-client privilege because that privilege is rooted in the common law: Both the attorney-client privilege and the exception to that privilege for crimes and frauds existed in the common law long before Arizona enacted an attorney-client privilege statute. *See Buell*, 96 Ariz. at 68 (quoting *Clark*, 289 U.S. at 15 (tracing history of the common-law attorney-client privilege to at least the time of Queen Elizabeth, and the common-law crime-fraud exception to the attorney-client privilege to the 19th century)). Accordingly, by codifying the common-law attorney-client privilege, the legislature impliedly authorized the common-law exception to that privilege for crimes and frauds.

**¶21**     By contrast, because the physician-patient privilege did not exist at common law, the legislature's enactment of that privilege brought with it no crime-fraud exception. As *Wilson* stated, "'[b]ecause there was no [physician-patient] privilege at common law, the [physician-patient] statute must be strictly construed.'" *Wilson*, 200 Ariz. at 393, ¶ 5 (quoting *State v. Morales*, 170 Ariz. 360, 363 (App. 1991)). Because the physician-patient privilege was created by the legislature, it is up to the legislature, not the courts, to adopt any exception applicable in cases of crimes or frauds. *Id.* at 395, ¶ 12.

## C.     Abrogation by Arizona's AHCCCS Statutes.

**¶22**     Although no common-law exception to the physician-patient privilege applies in Arizona, our legislature has created other exceptions to the privilege. *Id.* at 395, ¶ 11, n.3 (listing exceptions); *see Martin v. Reinstein*, 195 Ariz. 293, 320, ¶ 96 (App. 1999) ("the legislature has, in several instances, determined that the public good requires that statutory or rule-based confidentiality give way to serve a greater good."). We agree with the State that the legislature likewise has created a statutory exception to the physician-patient privilege that applies when a patient lies to a physician in seeking treatment for which AHCCCS otherwise would not provide reimbursement.

**¶23**     By law, health-care providers must report "suspected fraud" to AHCCCS, and if the agency's resulting "preliminary investigation" gives rise to a belief that a fraud has occurred, AHCCCS "shall" refer the claim for prosecution:

> All contractors, subcontracted providers of care and noncontracting providers shall notify the [AHCCCS] director or the director's designee immediately in a written report of any cases of suspected fraud or abuse. The director shall review the report and conduct a preliminary investigation to determine if there is sufficient basis to warrant a full investigation. If the findings of a preliminary investigation give the director reason to believe that an incident of fraud or abuse has occurred, the matter shall be referred to the attorney general.

A.R.S. § 36-2918.01(A) (2018).[6] Further, when fraud is suspected, Arizona law requires a physician to turn over a patient's records to AHCCCS investigators:

> Subject to existing law relating to privilege and protection, the director shall prescribe by rule the types of information that are confidential and circumstances under which such information may be used or released, including requirements for physician-patient confidentiality. . . . Notwithstanding any law to the contrary, a member's medical record shall be released without the member's consent in situations or suspected cases of fraud or abuse relating to the system to an officer of the state's certified [AHCCCS] fraud control unit who has submitted a written request for the medical record.

A.R.S. § 36-2903(I) (2018). AHCCCS may subpoena any record necessary to support an investigation and may subpoena any person to testify under oath. A.R.S. § 36-2918(G) (2018).

**¶24** These provisions together demonstrate a plain directive by the legislature that the physician-patient privilege will give way when necessary to allow investigation and prosecution of suspected fraud against AHCCCS. Although the cited provisions do not explicitly constrain the physician-patient privilege, they abrogate the privilege by implication when fraud is suspected by imposing disclosure obligations on physicians that are entirely inconsistent with the privilege. In the normal case, the physician-patient privilege does not permit compelled disclosure of the

---

[6] Those who report suspected fraud in good faith are protected from civil liability, while those who fail to report risk negative consequences. *See* A.R.S. § 36-2918.01(B)-(C) (one obligated to report AHCCCS fraud who fails to do so is subject to disciplinary action).

physician's records concerning a patient. *See Mincey*, 141 Ariz. at 439; *Rowles*, 21 Ariz. App. at 427. But when fraud against AHCCCS is suspected, A.R.S. §§ 36-2903(I) and -2918(G) require physicians to release a patient's medical records without the patient's consent. Indeed, § 36-2903(I) explicitly trumps the physician-patient privilege in such cases by compelling a physician to release patient records to investigators "[n]otwithstanding any law to the contrary."

¶25        Zeitner argues that even though the cited statutes may compel physicians to report suspected fraud and release patient records in such cases, it does not follow that the State may *use* that information to prosecute a patient suspected of fraud. We are not persuaded. Under § 36-2918.01(A), when a preliminary investigation by AHCCCS "give[s] the director reason to believe that an incident of fraud or abuse has occurred," the director "shall" refer the matter to the attorney general. The purpose of such a referral, of course, would be for consideration of prosecution. *See* Ariz. Admin. Code R9-22-512(A)(2) (AHCCCS may "release safeguarded information . . . without the [patient's] consent, for the purpose of conducting . . . prosecution . . . related to the administration of the AHCCCS program.").[7]

¶26        Zeitner also argues that no statute or regulation allows a physician to be compelled to testify about a patient's medical care. But under § 36-2903(I), medical records relating to a suspected fraud must be disclosed; that abrogation of the privilege necessarily implies that a

---

[7]        Although not raised directly on appeal, other courts have held that the Supremacy Clause requires a state physician-patient privilege to give way when necessary to investigate and prosecute Medicaid fraud. *See In re Zyprexa Prod. Liab. Litig.*, 254 F.R.D. 50, 57 (E.D.N.Y. 2008), aff'd, No. 04-MD-1596, 2008 WL 4682311 (E.D.N.Y. Oct. 21, 2008) ("The physician-patient privilege simply is not implicated when a state agency compels production of Medicaid records for use in connection with the agency's lawful functions; and to the extent that state law provides otherwise, it is trumped by the Supremacy Clause and by the state's obligations under the Medicaid regulations."); *In re Search Warrant for 2045 Franklin, Denver, Colo.*, 709 P.2d 597, 601 (Colo. App. 1985); *People v. Ekong*, 582 N.E.2d 233, 234-35 (Ill. App. 1991); *In re Grand Jury Investigation*, 441 A.2d 525, 531 (R.I. 1982); *cf. People v. Bhatt*, 611 N.Y.S.2d 447, 452 (Sup. Ct. 1994) ("[A]n exception to the physician-patient privilege . . . must be created to permit appropriate oversight of the Medicare program."). Given that we resolve this appeal based on state-law grounds, we need not consider the implications of the Supremacy Clause on the privilege.

physician may be called to testify about statements the patient made relevant to the suspected fraud. *Cf. Rowles,* 21 Ariz. App. at 427 (although nominally a testimonial privilege, physician-patient privilege also shields records a physician maintains for his or her patients). It would serve little purpose, and would make little sense, for a patient to retain the power to prevent her physician from testifying when the physician can be legally compelled to release the patient's medical records—the confidences the privilege is designed to protect already will have been disclosed.

¶27        In construing statutes, we "apply constructions that make practical sense" rather than those that "frustrate legislative intent." *State v. Hasson*, 217 Ariz. 559, 562, ¶ 11 (App. 2008). Construing the AHCCCS anti-fraud statutes to abrogate the privilege for records in which a physician recounts a patient's statements but not for the physician's testimony about those statements would frustrate the legislature's intent by impeding fraud prosecutions while failing to meaningfully protect a patient's privacy. Construing the reporting and disclosure requirements in §§ 36-2918.01(A) and -2903(I) to serve the purpose of investigating and prosecuting fraud, we hold that in cases of suspected fraud against AHCCCS, a physician may be required to testify about communications with a patient.

## CONCLUSION

**¶28**      In sum, as in *Wilson*, we decline to apply a common-law crime-fraud exception to the statutory physician-patient privilege. The reporting and disclosure requirements that AHCCCS imposes on physicians, however, distinguish a prosecution of suspected AHCCCS fraud from the workers' compensation fraud in *Wilson*. The reporting requirements that AHCCCS imposes on physicians and the requirement to disclose confidential patient information in cases of suspected fraud abrogate the privilege insofar as it otherwise might shield a patient's records and statements to a physician in such a case. Accordingly, the superior court did not err in declining to enforce the privilege and by admitting Zeitner's medical records and allowing the State to call her physicians to testify.[8] We therefore affirm Zeitner's convictions and the resulting sentences.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[8]     We may affirm the superior court's ruling for any reason supported by the record. *See Gila River Indian Cmty. v. Dep't of Child Safety*, 242 Ariz. 277, 283, ¶ 26 (2017).